Whenever you're ready. Good morning, I am Robert Sinkar representing the appellants. The Metropolitan Washington Airports Authority, or MWA, is an interstate compact entity that only has the powers given to it by its compact. Under well established federal precedents, when it has set tolls on the Dulles toll road to pay for the metro rail, it is exacting a tax and it has not been given the power to exact a tax under its compact. And so we are here claiming that this is an illegal exaction and we want our money back. Essentially, the toll road users are subsidizing the folks who will be using the metro. They're subsidizing the airport operators and the businesses at the airport that are benefiting from the metro. Remind me, how far does the metro go? It goes in the corridor, right? Yes. But it goes, extends beyond both ends or not? Yes, it does. It extends a bit into Tyson's Corner. It's sort of all of northwestern Fairfax County, Your Honor. It goes into Tyson's Corner and how far west does it go? It goes a little bit into Loudoun County past the airport. How far past? The exact distance, I don't know, Your Honor, but it's like... And it essentially serves the airport and then the real extension is in toward the Potomac. Yes, yes, exactly. So, and that's the whole purpose. When you, actually, the purpose of this all is in the ROD, the Record of Decision of the Federal Transit Administration in JA 238 and 239, and it says that the purpose of the metro and why it is a good choice is to serve the airport, to benefit the tenants there, and so on. Now, this decision about whether this is a user fee or whether it's a tax is one that federal courts have addressed in all sorts of different subject areas. The legal exaction clause of action is a well-established claim based on the due process clause, and there really is no way that a notion of prudential standing can dodge the issues before this court. These are solid legal issues that courts adjudicate all the time. So, my plan with my time is to first address the user fee versus tax issue, then address the compact, then talk a bit about prudential standing, and if I have time, though I may do this in rebuttal, address the Department of Justice's argument, which is here, which is a broader constitutional argument in our issue. From 1984 to 2005, the toll at the main toll gate was 50 cents. That is, from the beginning of the Dulles Toll Road to 2005, that was paying for the maintenance, the operation, all the repair work, all the costs that go into maintaining a highway. It is now $1.75, and next month it goes up to $2.50. It is disputed in this case, and it is in the record, that the only purpose of raising the toll was to pay for Metro and other non-Dulles Toll Road expenditures. A user fee is simply a quid pro quo. You drive up to a gate, you're putting your money in the bin, what are you getting? Under, again, very well-established precedence, which we've discussed at length in our briefs, if you are getting this road, your use of the road that day, and all the expenses you're paying for all the expenses that go with maintaining it, that would be a user fee. But what you're paying for now, and indeed the bulk of the money that you're you're putting in the bin and paying for, is a totally different mode of transportation that doesn't exist yet, that you may or may not ever use. Now that may be a good thing, and we are not here to... What if you redefined all that? I don't know if it's legitimate, but what if you redefined that whole description to say that they are developing a right-of-way to serve the airport, and the right-of-way has various mechanisms to get people to the airport in less time than would be on the back roads, and that one method, of course, of using the right-of-way is the road, the other is the metro, and that everybody who's using the airport contributes to the access, whatever you choose to use, the road or the railway. If you configure the for the use of the right-of-way in that broader sense, then you're within your notion of that's more of a user fee. Your argument, I guess, is the particular method of access by the road is distinct from the metro, but it's still a service of the airport. Well, actually, I have to disagree with you on a number of grounds, John. First of all, that's not a user fee. What you have described is a benefit that can be paid for by taxes. That's one thing we can't forget here. We're talking about benefits in terms of the user fee, but taxes have general benefits to everybody, and the pages I referred to in the Joint Appendix essentially articulate what you were just saying, Your Honor, that will move people through the Dulles Corridor faster to the airport, and so those are good things. We're not here to challenge that. But it's also the real estate is a right-of-way. I mean, it's federal real estate given to the state of Virginia and then permitted back, but we're defining a right-of-way created for a particular purpose with a particular mission. That's true. The fees are going to manage that right-of-way, the authorization to collect fees. Now, your argument essentially focuses on whether the how particularized the fee has to be collected for the use, but I'm suggesting that if you define the use, the mission, as broader than just using the highway, it's using the right-of-way. Then you have a little bit of a tougher case. Well, Your Honor, if you did that, though, you would be breaking with all the precedents that address this user fee versus tax question, because first of all, it's not a matter of nomenclature, and this Court's opinions, Supreme Court, Virginia Supreme Court, all the cases that we have cited make it clear that it's not a matter of In other words, the money doesn't go into the FISC. It doesn't go into the Treasury. It goes into the development of the right-of-way, and the whole authority, MWAA, was created for that limited purpose of transportation as opposed to That's true, Your Honor. No, well, actually, no, because when you look at the opinions, and I want to discuss one particular case I think will be helpful, which we've cited, which is the U.S. shoe case from the Federal Circuit, but before I get to that, let's remember that MWAA was put into place to manage two federal properties, Reagan and Dulles Airports, and that's it, and all of its statutory bases, the compact provisions and so forth, focus on that. The Dulles toll road, excuse me, the Dulles toll road was put into place to not serve the airport, because the access road going to the airport, which is the vehicular means of getting to the airport, they wouldn't open it up to the regular traffic as the neighborhoods down to Dulles developed. People wanted to use that road to get into town and so forth, and they said, no, we're going to have this separate road. So, first of all, the whole concept of the Dulles toll road is antithetical to the notion of airport purposes, and that's the history, which, when you look at these cases, these user fee cases, so they look at the history and purpose of what's going on and what the expenditure is. That's number one. Number two, they look at the real practical effect. The quid pro quo is a pretty commonsensical thing. What am I getting now? What am I using? Is the person who's using this government service or government facility paying for that use? And I mentioned the U.S. shoe case, and what's interesting about that case, it's a fairly obscure subject, which is the harbor maintenance tax, and the question was, was the harbor maintenance tax going to violate the export clause, which prevents us from taxing exports? First thing to notice, even though the exaction was called the harbor maintenance tax, the court said that doesn't matter. The words don't matter, and it was an exaction ad valorem tax imposed on commercial cargos, which went into a special fund in order to maintain and dredge harbors around the United States. The court ultimately concluded it was not a user fee, that it was, in fact, a tax, and it pointed to a couple different attributes. First of all, the direct users of the harbors didn't pay the tax. That is, the ship owners didn't pay the tax. It was the exporters who paid the tax, and that's too indirect. That's more like a tax. I mean, again, it's a good thing. Dredging the harbors is a good thing, so it's not that it was unbeneficial or irrational. It's just that these people were paying a tax. Number two, the amount of the tax, an ad valorem tax based on the cost of the benefit. It was a number, and it was fine for tax purposes, but in the quid pro quo of a user fee, the person who's paying it is paying a fair approximation, and we don't say it has to be... Ron, you look like you wanted to ask me a question. I would, but finish your sentence. Because there is one more point, and then I'm sorry. But also, it was paying for harbor maintenance all across the country. It just wasn't the harbor being used, and on those elements, the Federal Circuit said, this is a tax. It's a benefit, but it's a tax. And when you walk that through with what you see here, that the toll road users are not using the Metro, they're paying for a mode of transportation that they're not using, it's very clear. This is not a hard case. You can devise, as your honor was, hard cases. This isn't it. I'm sorry, your honor. Thank you. You indicated until 2005, the toll was 50 cents. Yes, ma'am. And now it's $1.75 going to $2.50, and the purpose of raising the toll was to raise funds for mass transit. Yes. But hasn't that always been the case? As I understand, as I read the record, the Virginia Assembly, when the Virginia Assembly was doing it, authorized the CTV to use surplus revenue from the Dulles Toll Road to fund improvements, including mass transit projects. That was in 1990. In 2002, the General Assembly approved a resolution providing that it would spend 85% of its surplus revenue from the toll road to fund mass transportation initiatives in the Dulles Corridor. So in point of fact, there has always been surplus from the tolls, and it has always gone to fund mass transit. So from that, it appeared, I extrapolate from that, that what you're arguing about is not the use of the money for the mass transit, because that has always been the case. You just don't like the amount. Your honor, actually, I think you're wrong, respectfully. Number one is the Dulles. With respect to which? With the point that this money has always been used for mass transit, and your implied premise that it was constitutional under the Virginia Constitution for the General Assembly to do that. First of all, the Dulles Toll Road opened in 1985. I'm wrong that the CTV raised the Dulles Toll Road rates. You're marking the additional money for paying its cost for costs of mass transit. I'm wrong that the General Assembly approved a resolution directing that 85% of the surplus revenue from the toll road be used to fund mass transportation. No, your honor, my point is that you're making observations of fact which are correct. What I'm addressing is the legal character of those facts, and I would contend, and we do, that they were always illegal. That they were always illegal, but you didn't object to them then. You're only objecting to them now that the rate has gone up. Well, the rate went up in 2005, your honor. What we're objecting to at that point, first of all, it was the Commonwealth Transportation Board that was doing it, so we have a very different circumstance with EMWA, but also the one point of fact that I do disagree with you, it wasn't always that way. From 1984 to 2005, when the rate went up. I didn't go back that far. If I could just ask one more. I'm sorry. So, specifically, would you object if there were surplus, if the toll fees, this two dollars and fifty cents, generated surplus for improvements, the existing transportation route improvements, would you object to that, or is it the fact that it has the label of being used for the Metro? Well, it's not the label, it's its actual use. If the charge for using the toll road reflected the costs of maintaining, even expanding the toll road, that would fit within traditional precedence of a user fee, but this does not. But it's not allowed to generate any surplus? Well, actually that's not true. Surpluses can be used for a range of different rainy day funds and so forth. Excuse me, I'm sorry. And so, the record doesn't articulate, and we don't know, you know, what surpluses are used for, but many of the cases talk about the needs for any federal entity managing a service or whatever, to have a surplus for emergencies and so forth. So, the test for what the cost of any service or facility being provided by the government is a flexible one. And I think you've clarified. I'm sorry to interrupt, but you're running out of time, and I wanted to say that, thank you, you have answered my question, that your focus is not on the fact of a surplus, but on the use of the surplus for that purpose. Yes. Thank you. Thank you. You've got some time remaining in reply. I think, yeah, I've heard from everybody. Thank you, Your Honor. Let's hear from Mr. Raphael. You didn't get very much of your agenda done. I didn't expect to, Your Honor, to tell you the truth. May it please the Court, Stuart Raphael for the Airports Authority. The District Court was correct on all four of the issues that are presented here, and you can affirm on any one of them. Let me just briefly say about prudential standing that the case is really difficult to distinguish from Parkridge. The Dulles Road Users Group, in that case, consisted of people who were using the toll road who were complaining about the tolls, and this Court, at page 3 of the Lexus opinion, said that that claim, that's how you all characterized the claim in that case. It was the same legal challenge to the same tolls by the same entity for the same project. What makes it the lack of standing? I mean, that is one aspect of it, is if somebody is charged a fee that's illegal, can't he sue to argue that it's illegal? Your Honor, we have not, we argued both Article 3 standing and prudential standing in the trial court. I don't want to put a label on it, because the labels don't help much in this case. I just want to know the general standing of the idea that somebody is injured if the Commissioner of Internal Revenue erroneously, erroneously, collects a tax above the amount authorized by Congress and by the regulations and makes an error and confesses the error. Couldn't any taxpayer that paid the erroneous amount sue to get that back? Your Honor, I think we'll concede for purposes of the argument that there is Article 3 standing actual injury when you pay a toll. We're focusing on prudential standing, which is not an Article 3 concept. It's a jurisprudential concept. Well, the problem with the prudential is so ill-defined and it borrows terms from Article 3 standing. Not only that, it's usually reserved for those cases where a person is outside the zone of injury. And here, this person is paying the toll. Well, the zone of injury, though, for a due process claim, he's clearly outside the zone of injury for that, because the Due Process Clause of the Federal Constitution does not reach a claim for taxation without representation. And the Parkridge case… That was the basis of their claim in the trial court. If you look at page 10 of the Joint Appendix, their complaint says they're complaining about… That goes to the structural representation that WMATA has created and is charging a tax as opposed to a fee. Well, let me turn to that. We think that the plaintiffs have confused whether their claim is based on federal law or state law. A federal due process claim does not reach this type of claim, as the U.S. Supreme Court made clear in the Heal case. So what they're really saying is it's a due process violation because Virginia didn't have the power to give the MWA to charge a tax, and therefore it's a due process claim. But at base, it's still fundamentally a claim for a violation of state law. And we'd cite Your Honor's opinion in the Kowalski case that says you cannot base a Section 1983 claim or a due process claim on a violation of state law. But let me cut to the heart of the case, which is, is this a user fee or is it a tax? And we now have… And that's governed by Virginia law. This is a pure Virginia law issue. And we now have a dispositive opinion on that point from the Supreme Court of Virginia. You all postponed oral argument in this case to get the benefit of the Supreme Court's ruling, which came down in ERC v. Meeks on October 31st. Meeks held that the Virginia General Assembly properly combined the Midtown Tunnel and the Downtown Tunnel connecting Norfolk and Portsmouth as a single project that was bond eligible, despite that those two tunnels were two miles apart. The court said that the tolls were user fees, not taxes. And the key language is on page 21 of the slip opinion, where the court said there were three considerations. Number one, the tolls were paid in exchange for a particularized benefit. Number two, they weren't compelled by the government. And number three, they were collected solely to fund the project. Let me take those in order. The tolls were paid in exchange for a particularized benefit. The users of the Downtown Tunnel got two benefits. Number one, they got reduced congestion in that tunnel because of the tolling system that also made improvements to the Midtown Tunnel. And number two, they now have the Midtown Tunnel as an alternative route. So those were the direct benefits to the Downtown Tunnel users, even though most of their toll went to pay for something other than the Downtown Tunnel. The same is true here. The toll road users will experience reduced traffic on the toll road and they will now have a mass transit alternative to using the toll road. And the key record citations for that, there are really three of them. The first is at page 224 of the record, where the General Assembly specifically found in 2004 that building Metro Rail to Dulles would reduce traffic for the entire corridor. Secondly, the Federal Transit Administration found, and this is at page 236 of the record, that because the roads are largely built out in Northern Virginia, you need alternative transportation modalities like mass transit in order to reduce congestion. That's page 236. And then at page 238, the FTA found that this project would provide shorter travel times for trips through the corridor, provide the greatest increase in person throughput capacity, and increase the overall mobility within the corridor. There's a map at page 257 of the Joint Appendix which shows you, in response to Your Honor's question, where are the stations. It shows where they are. There are two just past the airport that take you to the airport. There are four in Tyson's Corner. The rest completely parallel the Dulles Toll Road until the East Falls Church Metro. So this project is like building extra lanes in the toll road, but instead of putting cars on those lanes, you're having mass transit which can take a heck of a lot more people through it. And that's why there's a massive benefit to people driving on the toll road. There'd be much less traffic for them. There is no contrary evidence in this record to rebut those benefits to toll road users. I don't gather his argument is the loss of a benefit or the absence of a benefit. I think his argument is that the payment goes beyond the benefit to fund things for which he's not receiving the benefit. Your argument, I gather, is there's some fungibility in that. Yeah, my argument is that it's a single project, which the General Assembly repeatedly found. And secondly, the Dulles Toll Road users have a huge benefit in the form of reduced traffic and an alternative transportation method. Just like the drivers on the downtown tunnel have the midtown tunnel as an alternative transit opportunity and reduced traffic on the downtown tunnel. This case is really on all fours with Meeks, which was just decided by the Supreme Court of Virginia. The second point that Meeks made was that the government didn't compel anyone to use the tunnels. The court said at page 18 that there were two other non-tolled bridge crossings that offered a reasonable alternative to driving through the midtown and downtown tunnels. The same is true in this case. The government does not compel anyone to use the toll road. There are free alternatives, Route 7. I've never fully understood that argument. You go in to buy a widget in a store. That's a total voluntary act. You don't have to buy the widget, but when you buy it, you pay 6% tax. I understand. It seems to me you're not paying for the benefit. It's a transaction. The voluntariness of it, it seems to me if that's the only road, they could still charge a fee if it was just for the road. I agree. I agree. I think that one of the problems with the voluntariness concept is that it doesn't really prove enough. The best example is the McMahon case from the Supreme Court of Virginia where people were compelled to pay to extend water lines to their property whether or not they connected to those lines. It was involuntary. They had to do it. Nonetheless, the Supreme Court of Virginia said that was a user fee because it was a fee for a service and the people could use the system if they wanted to. I take your point on voluntariness. My point here is simply I'm tracking Meeks. That's right. Moreover, voluntariness here is conceded. At page 31 of our opening brief, we gave you the record citations where the plaintiffs conceded that the use is voluntary. The third factor in Meeks was that the revenues collected were used solely to fund that project. That was a three-segment project, the two tunnels and the freeway connector. The same is true here. The revenues from the toll road are strictly limited to use on the Dulles toll road and for the Dulles Metro Rail project in that corridor. If you look at page 120 of the joint appendix, you'll see the permit, section 4.01E, strictly limits, provides that the airport authority shall have no right to use toll revenue to pay any debt, obligation, or liability unrelated to toll road purposes or Dulles corridor Metro Rail purposes. The motorists also ignore here, as they did in Meeks, the huge deference that is owed to the Virginia General Assembly. In the Meeks case at page 16 of the slip opinion, the court pointed out that the General Assembly had made that single project determination repeatedly. And the same is true in the – I think their argument is pretty well taken, though. The legislature can have the most benign, but if they're unconstitutional, they're unconstitutional. They didn't have the authority to do it. I understand – Their argument basically is they're in a conspiracy with the legislature. They want these fees to be user fees. They want to have authority to do it. They don't want to have to levy a tax and this type of thing. Right, and – So they structure it in a manner that's unconstitutional. Their argument basically focuses on the constitution of Virginia, doesn't it? Yes, it does, but the significance of the General Assembly making that finding is that it's entitled to a presumption of validity and can be set aside only if it's an abuse of discretion or clearly erroneous under Virginia law. As the Supreme Court said in Meeks, there is no stronger presumption known to the law in Virginia than the presumption of constitutionality that applies to the legislature's finding. And in Meeks, it wasn't just that the General Assembly repeatedly found that it was a single project. That was supported in the record by reference to things like the Federal Environmental Impact Statement from 1996. The same is true here. It's not just the General Assembly repeatedly saying this is a single project, although it has. The amended record of decision from the Federal Transit Administration makes that clear because it says that building this project will reduce the traffic throughout the corridor and create an alternative modality which is needed because the roads are effectively largely built out in northern Virginia. It's also undisputed in this case that the toll revenues will fund only a portion of the total cost of the project. According to the complaint at page 39 of the Joint Appendix, they fund about 52% of the total project cost. It's actually less than that, but we'll assume, because this came up on 12B6, we'll assume they're right. The rest of the money comes from grants from the Federal Government, $900 million for Phase I, monies from Fairfax and Loudoun County, and also from Virginia. These tolls pay a smaller portion of this project than they did in Meeks. In Meeks, the tolls funded about 80% of it, but that was a $2 billion project. Here, they fund 52%. What's the legal significance of this? There's a long line of cases in Virginia that make clear that where the total revenues fund less than the project cost, it is not an improper revenue-generating device. That's what the Supreme Court of Virginia said in McMahon, in Tidewater Association of Home Builders, and in Mountain View, those cases that we cited. I also noticed that the U.S. Supreme Court, in a different context, said the same thing in the Evansville-Vanderbilt Airport case from 1972. In that case, the thing was called a tax, but the Supreme Court of the United States said it was a user fee, and the monies raised were less than the cost of operating the airport. There is no response to this argument in the motorist brief. Mr. Sinkar referred to a quid pro quo test. You don't see that language in the cases by the Supreme Court of Virginia. His colleague, counsel in this case, who represented the motorists and MEECs, they made the same argument there, and the Supreme Court of Virginia did not accept it. The U.S. shoe case that Mr. Sinkar described, we've distinguished at pages 51 to 52 of our brief. Let me speak briefly to preemption. Assuming for the sake of argument that these tolls are taxes under Virginia law, the federal law authorizes MWA to charge the tolls, and therefore there would be preemption. We reached this last, and you don't reach this, according to your decision in Columbia Venture, if you can decide the case on independent state law grounds. But there were three arguments for federal preemption that we advanced. I'm going to leave the compact preemption issue to Government Counsel, who has five minutes of time here. But let me begin with 49 U.S.C. section 49106B2B. I'm sorry that's so long. That's from the Transfer Act. You'll find it at page 8-9 of the red brief in our statutory addendum. What that provision says is that bonds issued under the Transfer Act, quote, may be secured by the airport authority's revenues generally or exclusively from the income and revenues of certain designated projects, whether or not any part of the projects are financed from the proceeds of the bonds. That's exactly what is happening here. MWA has issued $1.3 billion in bond monies, in bonds, that are secured by Dulles Toll Road revenues to finance the construction of Metrorail. There's another billion coming. Those bonds are secured by the total project. It's a little under $6 billion, Your Honor. You're only $2 billion along the way? That's, well, there are other, the government, the United States has contributed $900 million towards phase one. Well, it's a lot of money. That's some money. My questions are, I withdraw. All right. The bonds are secured by revenues from the toll road, and as the statute provides, MWA can do that, whether or not the toll road is financed from the proceeds of the bonds. So if the motorists were right that we couldn't do this under Virginia law, it expressly conflicts with 49-106-B2B and that there's express preemption for that. The other preemption argument that I'll just touch briefly on is the federal aviation law, which specifically requires airports to charge rates that are self-sustaining. It distinguishes between non-aeronautical and aeronautical charges, and the FAA in its 1999 policy encourages airports to charge fair market value, market value for non-aeronautical services like the toll road. If we couldn't do that, according to the plaintiffs under state law, it would clearly violate the Virginia Constitution. Let me just close by saying that the Virginia legislature was well within its rights to recognize the Dulles corridor as a single project. It was rational to conclude that extending Metrorail to Dulles would reduce traffic on the toll road and give those drivers an alternative. This is the third lawsuit challenging tolls on the toll road. Enough's enough. Please affirm. Thank you. Mr. Blair. Thank you, Your Honor, and good morning. May it please the Court, I'm Jeffrey Blair. I'm Justice Department counsel on counsel for the United States as amicus curiae in this matter. Your Honors, I'd like to pick up where Mr. Raphael left off. There's been a substantial amount of discussion this morning about whether these tolls are user fees or taxes. If you agree with Mr. Raphael's argument, you could certainly affirm on the state law grounds that these are user fees, not taxes, and therefore don't run afoul of the Virginia state constitution. It's our contention that this is a distinction that for purposes of federal law does not matter. There is a federal statute that has a set of specific and particular requirements and provisions applicable to this conduct. It specifically authorizes the airport authority to levy fees or other charges to be used for airport purposes. These tolls certainly fall within the ambit of charges under the statute, whether they are user fees or taxes. And to the extent that the Virginia state constitution would otherwise preclude the authority from exercising that power, those provisions are preempted by the terms of the compact that has been ratified by Congress and as well by the terms of the specific federal statute that authorizes these charges. The principal argument from our opponents here is that, well, the legislature can only vest in the airport authority such powers as the legislature has, and it doesn't have the authority to delegate state taxing power and derogation of the state constitutional requirement. With that proposition, we would disagree. When a state enters into an interstate compact, it does so with the knowledge that it is creating a new kind of entity and that the terms of the compact, once ratified by Congress or once adopted by Congress, are federal law that will preempt contrary state law, including contrary provisions of state constitutional law. Do those principles apply even if the state illegally joined the compact under its own law? Well, I think they do, Your Honor, because the notion of an interstate compact is that the state is entering into an entity that, once it is approved by Congress, can take actions that are inconsistent with state law. And that is the understanding that derives from compact clause jurisdiction, and it's an understanding that the legislature and the state governor must be presumed to have when they authorize the creation of the state compact. So limitations that would otherwise apply to state action— If two states enter into a compact and one state, there's a constitutional provision that says our state may not enter into a compact with another state under the federal compact clause. Well, I think you're— If you had that hypothetical, would there be an argument that somehow the compact, the authority, was unduly constituted? Your Honor, confining my answer to that narrow hypothetical, that might present a different question because it is a specific limitation directed to the authority to enter into the negotiations to have a compact in the first instance. It's hard to imagine a circumstance where that could really play out in the real world because, as is the case here, Virginia had to enact legislation that authorized the compact. The governor had to sign it and enter into it. So a situation where both the legislature and the governor would enter into a compact, notwithstanding express and explicit directions not to enter into a compact, I'm having a hard time seeing how that would be a real-world kind of hypothetical, Your Honor. I think the more— I understand your argument. I mean, it might be exemplified better by a notion that the legislature thought it was authorizing user fees and subsequently, 10 years later, Congress authorizes the collection of taxes and uses the word taxes. They may still be stuck with that. They may, well, indeed, be stuck with that. Your Honor, in the brief time I have, I did want to address briefly the Article 2 argument that the motorists have raised here. They are making assertions that granting certain powers to this interstate compact agency violates the Article 2 requirement that it is the president who must take care that the laws are faithfully executed. Our principal contention here is that this is an argument that has been waived. There's no discussion of this in the opening brief and, consequently, no discussion of the issue in the amicus brief the United States filed here. I think the motorist contention will be, well, this is an issue that came up somehow as a consequence of the brief that the government has filed here. That simply is not the case. If you look towards the end of the district court opinion, the district court expressly addressed Article 2 contentions. Now, the court didn't say a lot about them because I think, correctly, the district court thought these arguments were insubstantial. But the district court opinion itself indicates that these were matters that were raised below. They have not been raised here and, therefore, are not properly before the court. If I could have one moment to address the merits, Your Honor. Thirty seconds. Okay, Your Honor. If the court thinks that the issue is properly before it, we note that the federal government retains important controls over the airport authority. Airport property is leased to the authority. It must be used for airport purposes. If the Secretary of Transportation concludes that airport purposes are not being furthered, it has the authority to demand compliance and the final analysis to terminate the lease, to bring actions to enforce compliance of the lease. All those things that are in the statute, as well as the lease provisions at page 321 of the appendix, all those things combined give the federal government ample control, ultimate control for purposes of the Article 2 argument. Thank you, Mr. Clare. Thank you. Sankar. First, we didn't waive the argument. If you recall, we have followed a tortured path to get to this court. Initially, we believed that MWA was a federal instrumentality. We went to the federal circuit and we raised all the constitution of the Article 2 arguments there. That court ruled that it was not an instrumentality, and so we came back to this court. And it is only through the preemption arguments of the appellee, and my colleague from the Justice Department actually even makes a more muscular one. It's not just, as I read his brief, it is not just the compact, but it is the federal statute by itself that has a preemptive power here. If you add that to the fact that this is an entity that is managing federal property, it's an absolutely unique interstate compact. There's never been an entity like this ever. Its whole purpose is to manage federal properties, to solve a federal problem. The lease explicitly gives it the powers of the Secretary of Transportation, and it has a whole range of federal restrictions on it. I contend that the government's brief here is, in effect, a motion to reconsider the federal circuit's ruling that this is not a federal instrumentality. And once you do that, once you go down the preemption line, he's right. It doesn't matter whether this is a fee or a tax because the president only has the power to appoint three of the 17 board members, and under the Free Enterprise Fund case, that's a violation of his responsibilities to take care that the laws be faithfully executed because this is a federal instrumentality taking money using federal power. Now, we have tried to be a little bit more conservative in approaching this case, but if you go down that route, we've got to win no matter whether this is a fee or a tax. But it also illustrates that there was a bit of a dichotomy in my colleague for the appellee's argument. He focused on Virginia law, but a compact approved by Congress is federal law, and it's federal precedence that you use to construe the words, which is why I focused on federal cases. And there is no word involving taxation there, just purely on the textual basis of the compact. And so Meeks itself focuses on Virginia law, but frankly, it's just distinguishable on the facts because once again, as I was saying in my opening, the court did this in-depth analysis of the history of that project, and that project for 70 years, that facility was being given to people, was vehicular connections between Portsmouth and Norfolk. And so it's tunnels and bridges, and that had always been considered as one facility, and that was the court's construction there, that that's why it was a user fee. It didn't abandon or overturn any of these principles distinguishing user fees or the fact that the General Assembly can't delegate taxing power. Now, one important illustration here, besides the fact that you have this entity that is independent of every form of government we know. I mean, just think about that. Is this entity a creation of Congress? Is that the only way it can happen under the compact law? No. It was a creation of Virginia and the District of Columbia, and it was approved by Congress. Well, Congress has to approve it, doesn't it, through statute? Yes. Yes. But also, both the federal statute and the compact itself says that EMWA only has the powers given to it by the legislative authority of Virginia and the District of Columbia. And the power to impose tolls to pay for Metro only comes to EMWA from its deal with VDOT, through the permit, and it doesn't come from the legislation. Remember, the compact legislation was passed way before Dulles Toll Road and the Metro was even being considered. So the text of the compact itself doesn't provide for this taxing power, and it doesn't provide for the power to exact money to pay for Metro more explicitly. That only comes from, arguably, this contract, this deal with VDOT, which under the terms of the compact itself, that's not the legislative authority of Virginia. It can't be given that power. So I would urge the Court that really the sort of most conservative resolution of this case is to rule that this is an illegal tax, that we have stated a cause of action, and we go back and litigate it. Finally, and I'm sorry to be speaking so quickly, but I'm trying to get into a couple different things. The other thing is there is no record here that this is going to relieve congestion. That is simply not true. The only pages in the record that address the question of what is happening here are the ones I discussed with the Court, JA238. I don't think it's self-evident that if you add a rail line along a highway with the same destination, it will relieve congestion. Actually, it isn't, Your Honor, and in the policy debate over this, there's a lot of back and forthing and guesstimation of whether it will relieve congestion. In fact, many people think it's going to be the added tolls that will relieve congestion because people won't use the toll road. It's not going to be the Metro. But even if that were the case, that is one of those indirect benefits, just like in the United Shoe case, that, okay, it's a benefit. There's a benefit to the whole transportation network in northern Virginia, and that's a good thing, but it should be paid for by taxes, not by toll road users. And my time has expired. Thank you, Your Honor. Thank you. All right, we'll come down to Greek Council and then go on to our last case.
judges: William B. Traxler, Jr., Paul V. Niemeyer, Allyson K. Duncan